City Council and the Illinois Pollution Control Board, et al. On behalf of the FOE, United City of Yorkville, Mr. Leo Jombrowski, on behalf of the Illinois Pollution Control Board and the Attorney General's Office, Mr. Brett Flake. Because of the many issues involved in this case, instead of 15 minutes, each side will have 20 minutes, and then 5 minutes for rebuttal. And I understand that you're going to split your time 50-50 between the appellate and the athlete. Is that correct? You may proceed. Thank you. If it pleases the Court, I am George Mueller, one of the attorneys for Fox Moraine. I will give the opening argument, and Mr. Helston will give the rebuttal. Your Honors, landfill siting cases are inherently difficult, and that is for a number of reasons. They tend to have very large records. They involve often technical and excruciatingly boring issues. They tend to be locally unpopular and controversial. But they're also important because solid waste disposal is an indispensable and vital utility in our society, and people only need to miss a garbage pickup in order for them to realize that point. Now, one would think that the Pollution Control Board is ideally suited to the task of reviewing landfill siting decisions because of their technical expertise. In this case, the Pollution Control Board, Your Honors, did not do its job. And in part, it did not do its job because it didn't understand the scope of the job that it was required to do. Well, do you believe it should re-weigh the evidence, Counsel? I don't believe that this Court should re-weigh the evidence. I think the Pollution Control Board, based on town and country, clearly has an obligation to look critically at the evidence. And where do you see that in town and country? Well, town and country have mandated that the Pollution Control Board must conduct a hearing on a review of a local siting decision. And they say that even though that hearing is confined on the substantive criteria to the record made locally, that the technical expertise of the Board has to come into play. And they also state that the hearing has to be in accordance with the procedures in Sections 32 and 33A of the Act. And 33A specifically requires due consideration to be given to the evidence by the Board. Moreover, the Court in town and country, in describing a Section 32 and 33 hearing, said there need to be factual findings and legal conclusions reached. So, again, I'll ask, does the due consideration require re-weighing the evidence or something different? You know, the last question I asked Mr. Helston before the panel came out was, I said, how do I answer the question of what standard the Pollution Control Board should use? Clearly it's not the manifest weight standard that they've been using because that ignores the mandate of town and country completely. We also don't think it should be a de novo standard because the Court in Peoria Disclosal mistakenly thought that that was what was being advocated. It needs to be some type of hybrid standard. And to give Your Honor an example, in the case of several witnesses locally, they simply didn't understand the criteria. And perhaps the local decision maker didn't understand it either. But the Pollution Control Board is certainly well equipped to make those kinds of competency judgments to determine whether evidence is even on its face likely to be reliable. As one additional example, and I know I'm not supposed to belabor facts in an argument, but I think it is very telling here. As to the operational experience criteria, the PCB found that the city could have ruled against Fox Moraine because the proposed operator had some minor violations in its past. However, there were a handful of violations in 90 years of operation and none in the last 15. And a record which the technically qualified Pollution Control Board is perfectly capable of understanding as being exemplary. And so the evidence, when viewed in a technically qualified light, weighed in favor of Fox Moraine and not against them. And that's the owner's experience and the operator's experience with respect to operating the landfill. That's one of the factors. Yes. And my point, Justice. And attempt. Right. And my point, Justice. How much experience did they have? Well, the new entity had none, but the new entity was co-owned by Peoria Disposal Company, which has been in the business of, in that business for 90 years, and had perhaps the And the PCB had that knowledge and refused to interject it in order to make sure that ultimately a correct decision was going to be made. But wasn't there some question about whether the other owner, which would be Mr. Hammond, would have some sort of control and he was not as experienced as the Peoria disposal entity? Again, the entity that was going to operate was a new entity. And while Mr. Hammond, and it's not in the record, has some experience in environmental matters, it hardly seems as if it is a legitimately correct decision locally to say that because this new corporate entity has no experience, we're going to find that they're incapable of managing the facility. That's why Peoria Disposal was there. All right. Let's go back to town and country, if we could, for a moment. The court there said that there were faulty scientific assumptions engaged in by the local entity that should have been corrected by the PCB. What faulty scientific assumptions exist in this case? In this case, there were no faulty scientific assumptions by the applicant. The faulty assumptions took place by the city, allowing lay testimony to rise to the level of expert evidence. The application witness was a retired school teacher, a wonderful gentleman, who basically got his information from the Internet and concluded that based upon that there was a glut of landfill capacity. That's not competent evidence. And for the city to elevate it to competent evidence and for the Pollution Control Board to decline to say we can't allow that kind of Internet hearsay to be elevated to expert evidence is an abdication of their responsibility under town and country. But was that a scientific issue? As I read town and country, it looked more as if we were talking about truly scientific issues, not whether there were, in this case, enough landfills in the area or the length of time that they would be open and how long it would take to open this one. But really, town and country was talking pretty heavily about scientific assumptions. Justice Hutchinson, the only real scientific, purely scientific inquiry is as to public health safety law. And on that inquiry, the only evidence that was offered against Fox Moraine was evidence from an individual about stormwater management, and he admitted that he had never reviewed a stormwater management plan for a Pollution Control Board facility, a pollution control facility. Accordingly, it becomes obvious that as to that scientific criterion, there was no evidence whatsoever on which the city could rely in its finding that the facility was not so designed as to protect the public health safety and welfare. And the PCB, again, did not step in and say you're not free to make that decision based upon political pressure and agendas of certain individuals, particularly the mayor. Do you agree that the plaintiff lacks as a burden approving each of the nine criteria or the ten criteria, depending on how you describe the last paragraph? Absolutely, Justice Paul. And what about traffic? With regard to traffic, the witnesses who testified in opposition were two traffic engineers who were at least nominally qualified to offer testimony, but one of them talked about traffic impacts in the village of Plainfield, some 17 miles away, and that is clearly beyond the scope of minimizing traffic impacts, and the other witness misunderstood the criterion. The criterion is to minimize traffic impacts, and by definition, that acknowledges that there are going to be some traffic impacts and probably negative ones. What that first witness, Mr. Coulter, I believe, testified to is that any increase in traffic was bad and therefore rendered the criterion unmet. Now, that's the kind of conclusion that a layperson such as a city council member could easily adapt because they don't understand the criterion either. The PCB there had the obligation to say since the witness's testimony didn't address the criterion, the requirement of minimization, for that reason, the witness's testimony should be discounted. That's the role that we think town and country envisioned for the board. Well, minimization is an interesting concept as, you know, there will be more traffic as a result of this. Now, how then do we minimize that issue if there's going to be more traffic? Do we build new roads? Does Fox Marine contribute to new roads? Well, what do we do? Well, actually, building new roads is an interesting concept because certainly roadway improvements are always part of the minimization process. You build turn lanes, speed up lanes, and so forth. The other is to route your traffic in such a way that you're using appropriate roads for the traffic, which was done in this case and which no witness was able to contradict. And why doesn't Plainfield have a stake here? Because, I mean, the waste is not just coming from the interior of Kendall County and Yorkville. It's coming from seven or nine other communities. And Plainfield seems to be in the way. Plainfield's stake was minimal in terms of there being 16 or 17 miles away. And what the witness testified to was that there would be some impact on Plainfield. He never testified that Fox Marine had failed to satisfy the criteria. Well, didn't he testify that there would be 200 additional vehicles, specifically trucks, going through Plainfield on a daily basis? On a per-day basis. That's a lot of trucks. Yes. And if you open a distribution center, which requires no permitting at all, you're probably going to have five times the amount of those trucks. But they didn't do that. I understand that. So we're talking about this, not what could happen. We're talking about this. There is a Menards distribution center someplace in the vicinity, right? There is actually one on the north end of Yorkville, yes, which probably has a many-fold greater impact on traffic than a potential landfill would. The point, Justice Hutchinson, is that the PCB didn't even engage in the kind of dialogue or inquiry that you and I are engaging in now, and your questions are way more meaningful than anything the PCB asked as they looked at this record. How do you solve the problem of Hollenbeck Road? Apparently one of your witnesses testified it was necessary to redesign or relocate Hollenbeck Road, and it's relatively clear from the hearing that the city had no intention of doing anything with Hollenbeck Road. In fact, I think in the city's findings, they indicated that they would make no changes to Hollenbeck Road. Well, that's because the city denied the application. The city has the right, and it is contemplated, in the Environmental Protection Act to condition approval, and you can condition approvals based upon road improvements. I have another question going back to the second criteria. Wasn't there evidence that this landfill would have an adverse effect on the aquatic ecosystem? There was public comment to that effect. Well, wasn't there actually an application withdrawn that had been submitted to the Army Corps of Engineers to reroute and move a stream, but there were concerns that that wouldn't be possible and there would be a violation of the Clean Water Act? No. The process of wetland mitigation, which I believe is what Your Honor is talking about, is a separate process that goes through the federal government and generally is a parallel process and often takes quite a bit longer in terms of wetland mitigation, and you can't go forward with your site until the Army Corps of Engineers has signed off on the specific question that you're asking. It's actually a question that is specifically beyond the scope of the local siting criteria. So that's not a prerequisite for going ahead with the siting application? That's correct. It's a prerequisite for getting a permit. Okay. Is there a legitimate concern that the local entity has about that issue, however? If you look at the totality of the record, you'll see that several of our witnesses testified that from a purely physical location perspective, regardless of traffic and real estate impacts, this was probably as good and safe a site for a landfill as you're ever going to find. It was protective of the public health at a number of different levels. The site actually met state performance requirements without having an engineering liner there, even though we would have been required to put one in. Do you agree that the board found that the plaintiff failed to prove criteria 1, 2 and 5, and 3 and 6? And what they would call criteria 10. 10 is linked to 2 and 5. Right. We want to put a number on it so it's more easy to refer to. I agree that that is what the ultimate decision of the city council came down to. And we're reviewing the board's decision, is that right? Yes. Even though the city found violations of more criteria, we're not concerned about those excess criteria. I think the board simply affirmed the city on every criteria. I think they found that 1, 2, 3, 5, 6, 8, and 9 were not met. I don't think 9 might have been an error by the city. Nobody ever argued that this was in a regulated recharge area. It was just a mistake. Right. And our complaint here is that the board really didn't do a review of the city's finding, and that that review is particularly important when you have manifest reasons to believe that the proceeding itself was unfair in terms of the bias and prejudgment by the decision. How many changes was the board's finding? 81 or 82, single spaced, of which about 3% maybe represented analysis, and the rest was a recitation of arguments and evidence. I mean, your honors, I read that decision the first time. I'm thinking to myself, I'm winning here. As they're reciting the evidence and the arguments, and all of a sudden they say, we declined to reverse. So it was bulk. It wasn't analysis. So you're saying if they had analyzed the evidence, again, I know we're back to the first question I asked, but can you again articulate what you think the board should have done? The board needs to find, for two reasons, that the ultimate decision locally made was correct. The first of those reasons is to ensure that there was a fundamentally fair proceeding, because the whole purpose of the fundamental fairness rules is to make sure that they get it right. And when there is a lot of reason to believe that the decision was influenced by politics or prejudgment or whatever, I think the board has an enhanced duty to make sure they get it right. The second is the mandate of town and country, which says the board has to have a section 32 and 33 style hearing, where they give due consideration to the record, where they make findings on evidence. And while we don't believe that's a de novo review of a record made below, it is at a minimum an obligation for the board to determine whether a witness relied upon by the city was even talking about the criteria, to determine whether a witness's testimony was even competent, as opposed to hearsay gleaned from the Internet. Those kinds of considerations are what the board is well qualified to make, because they deal with the substantive issues every day. And the court in town and country said the legislature obviously did not intend for localities to have the last word. And just to see enough, I feel as if I know town and country pretty well. The only other person that may know it as well as me is my co-counsel, Charles Helston, because we argued the opposite sides of that case in Springfield. When the legislature set up the procedure to allow a municipality to hold public hearings and act in a quasi-judicial capacity, isn't it fully expected that you're going to get many lay people coming in and giving opinions and viewpoints that have some weight, maybe not the weight of somebody that's trained as an engineer or a hydrologist? And wouldn't the board assume what the intent of the legislature is with respect to evaluating that type of testimony when it comes from lay people and school people that are well-qualified experts? Justice Bowman, if I may, the process welcomes public input and participation. The process also is inherently difficult because we're asking politicians to make a non-political decision, and therein lies the rub, and that's why the role of the Pollution Control Board, in terms of being hands-on and proactive and intelligent in their review, becomes so important. Otherwise, there is no likelihood or certainty that you're ever going to get it right at the local level. Did that mean that I'm out of time, Your Honors? Yes, it did. The bell rang. If there are no more questions, then I thank you for your time and the questions. I hope that my answers were helpful. Good morning, Your Honors. May it please the Court. Identify yourself for the record. My name is Brett Wagner. I'm Assistant Illinois Attorney General, and I represent the Illinois Pollution Control Board. Your Honors, I will be addressing the town and country issue and the criteria, Section 39.2 criteria, and my co-counsel, Mr. Dabrowski, will be addressing the fundamental fairness issues. Let me ask a quick question, and I don't mean a short-circuit your argument, but did town and country change the standard of review that the Board should employ? No, Your Honor, and I would disagree with a number of things that the petitioner said, but one of those being that petitioners know town and country best. I argued town and country for the Pollution Control Board in Springfield. During that argument, the oral argument, the Court asked me, why does the Pollution Control Board review the local society decision on a manifest way decision? Does the statute compel that? What compels that? And the answer was, prior decision, prior appellate court decisions have consistently, since the mid-80s, set out that standard for the Pollution Control Board, and it's required to follow that. The Court then asked me, well, that's not really an issue in this case anyway, is it? And the answer to that, of course, was no, and that is reflected in town and country. The Court in town and country certainly knew. It states at page 120 of 225.02 at 120, it states, it recaps town and country's argument in that case, trying to draw a distinction between the Pollution Control Board's actions on a citing decision, citing approval decision, or a permitting decision. And in town and country, it explained that the Pollution Control Board reviews a local society decision under the manifest way of the evidence standard. The Supreme Court certainly knew that. The Supreme Court knew from the briefing, as well as from my discussion with it, that there are a number of appellate court cases that require the Pollution Control Board to review the local society decision under that manifest way standard. Well, the Supreme Court can always make a change. The Supreme Court can. That's their job by day to day. Absolutely, and no, my point is that the Court knew this was being applied, and it wouldn't self-selectio affect a change, especially one that would overrule a number of appellate court decisions that it knew about. It wouldn't just overrule those and not mention those decisions in its decision. All right, so in leaving that standard in place, what is the job then of the PCB? The Pollution Control Board's job is, and it's exactly what happened in the town and country case, the Pollution Control Board is to review the entire record prepared by the local citing authority. It reviews it to determine whether it was against the manifest way of the evidence. In making that determination, the Pollution Control Board brings its technical expertise to bear. Are they acting as a judicial body at that point in time, a quasi-judicial body? Are they acting as a quasi-executive body? What are they? It's really hard to characterize. As they are an administrative agency, part of the executive branch of government, engaging in an adjudicatory function, but not as an initial trial of fact, sort of an appellate adjudicatory function. Now, in town and country, what happened was, for instance, the local citing authority gave approval. And one of the things it gave approval of, well, on all criteria, but one of those specifically at issue  It based its decision on, and the public health and safety issue, came down to the hydrogeologic characterization of the underlying silurian dolomite, the bedrock, that was below where the landfill was supposed to be built. The applicant had characterized it as an aquitard, meaning that water would not flow through it from the landfill. And in support of that, the applicant, town and country, offered one 1966 study of the area, which had since been superseded, and one soil boring over a 300-plus acre landfill footprint. On the other side of that was a lot of testimony, more recent evidence, and other testimony, scientific testimony, that one boring is not enough to make that determination. Using its technical expertise, using the engineers on staff, the Police Control Board was able to say, that's against the manifest way of the evidence. That is not enough. The Police Control Board didn't make a de novo decision there. The Police Control Board said, that evidence, that's against the manifest way of the evidence to make that conclusion. The opposite conclusion is compelled. Do the PCB engineering staff actually testify, or do they make this recommendation of some sort, or review some sort, and make a recommendation that the petitioner knows about, or the applicant knows about? I mean, how do the staff participate? Physically, how do the staff participate? After the briefing, and any hearing that the Police Control Board may hold on the fundamental fairness question, because the Police Control Board is forbidden by the Environmental Protection Act from considering new evidence on the criteria. The board sits and considers it. They have their experts, they have their engineers, analyze the evidence, look at the criteria, make their recommendations, and it will go before the full board, who will then make a decision, which will then be written up. Does anybody get to question them, other than the board members? No, they're not subject to cross-examination by the parties. What's your response to the position of the appellant that the board failed to use their expertise, as evidenced by the 84 or some pages resolution that they adopted? Well, you know, I think the fact that the board issued an 84-page decision shows that it analyzed the record. It was a huge record. Landfill site records are huge, thousands and thousands of pages. The board discussed, described the evidence on both sides, as well as the decision below, and made a decision at each point. I think, if anything, the fact that there's an 84-page decision shows the board's deliberative process, shows that the board considered evidence, and within the standard of review that's been imposed by a number of appellate decisions, including this court in the City of Rockford case, said, look, on all of these criteria, there's evidence, or virtually all these criteria, there's evidence that goes both ways. But now, with respect to the eighth criteria, didn't the Pollution Control Board fall down in its responsibilities? Didn't it have a duty there to make a threshold analysis of whether the proposed site was within the jurisdictional limits of the city or the county, and then go on to decide whether or not the county's plan was consistent with the local solid waste management plan? And it didn't do that, did it? The board did not analyze whether the county's solid waste management plan was consistent with the other law. It is the board's position that it does not have the authority to declare illegal on that. It's a pure legal question of whether this complies with state law, but the board does not have the authority to make that determination. Well, it didn't follow the mandate of the eighth criteria under the statute, though, did it? It did to the extent that it was allowed to make inquiry, which is, given a solid waste management plan, is this permitted or not? It is true the board did not look into whether the solid waste management plan itself was consistent with law, because it is the board's position that it is not allowed to do that. For instance, it has never been told that it is allowed to do that, and generally the board feels that it exceeds its ability as an administrative agency consistent with the role of our administrative agencies to declare something in violation of a state statute, to strike down a law, basically. The board does not believe it can strike down a county law. Well, I don't think that section requires them to strike it down. It required them to make the determination of whether the facility is consistent with that plan, reading from that section of the statute. And the board did make the determination that the facility was inconsistent with the plan. Let me just interrupt this a minute. Regarding Nate, will that be argued by the other? Yes, Your Honor. Maybe you should withhold that until we focus on that one issue. I'll be happy to. I assume that that's the way they broke their arguments up. Well, I guess the only reason I asked is the counsel indicated he was going to discuss the criteria. Well, you'll have ten minutes to discuss the appellant's other arguments, and I assume the other part of that argument will be Item 8, Criterion 8. Okay, Your Honor. Thank you. That's fine. Which will make a little more sense to get the connectivity. I appreciate that, Your Honor. Going back to the town and country issue for one minute, the sort of dual manifest way of the evidence standard, while not the most elegant standard in the world, not the most easiest standard to describe in a brief, is the correct application of the statute. If I may just conclude this point. Yes. Thank you, Your Honor. The General Assembly allocated to the local authority the initial decision, the authority to hold a hearing, to sit and look at the credibility of witnesses, to examine their testimony, to actually physically watch them testify, and to make the initial determination. That's a recognition of the local importance of landfill siting. The General Assembly didn't leave it just to laymen, of course, by then imposing this extra layer of pollution control board technical expertise review over the subject matter. The double manifest way of the evidence standard, by which the board reviews the local authority for manifest weight and then is reviewed by the appellate court under the manifest weight standard, accommodates all concerns that the local authority and the initial trier fact be given the first say and a meaningful role in this process, and that the board and its engineers can have a meaningful role and bring their technical expertise to bear. A common country does not say otherwise. Thank you very much, Your Honors. Thank you. May it please the Court, I'm Leo Dombrowski, representing the United City of Yorkville. I'd like to address the fundamental fairness issues that have been raised in this case. There have been a lot of heated allegations by Fox & Moran in this appeal. For example, Fox & Moran claims that several anti-landfill activists ran for aldermanic seats, that there was collusion among some of the candidates, that several aldermen prejudged the landfill application and didn't give Fox & Moran a fair shake, that the proposed landfill was at the center of some of the candidates' political campaigns, and even that some city council members decided the merits and declared how they would vote before the evidence was presented. What's our standard of review on this particular issue? Your Honor, it's a clearly erroneous standard of review. So it's a little less deferential than the manifest way to the evidence standard, but not all that much. And as the Pollution Control Board found in its lengthy 80-some page opinion, that there was no evidence to support Fox & Moran's allegations of unfairness. And I'd just like to set out the backdrop against which these landfill siting hearings were taking place. Fox & Moran filed its landfill application on December 1, 2006. Four and a half months later, the city of Yorkville was holding mayoral and aldermanic elections. By statute, the local siting authority has 180 days to receive the application, review it, hold siting hearings, and make its decision. If they don't act within that 180-day period, the application is deemed approved by operation of law, by the landfill siting statute. Counsel for Petitioner is certainly correct that when a landfill siting application is filed, it's certainly a very controversial thing and a subject of great concern, especially in a town like the city of Yorkville with 13,000 or 14,000 people, which was conducting the landfill siting hearings at the same time they were running for election or re-election. Now, Counsel, after the new mayor was elected, there was a report called the Roth Report that was issued, or I guess by an attorney at the Wildman Law Firm. Correct. That report was discussed openly by the alderman during the deliberations on the siting application. Isn't that correct? Well, some of the mayors referred to it. Certainly one alderman, Alderman Mons, referred to that Roth memo. Right. And wasn't the discussion, I believe the record reflects discussion by more than one alderman, didn't that waive any attorney-client privilege with regard to that report? No, we don't think that was waived, Judge. Why not? The, well, the, there's nothing in the landfill siting statute or in the case law that says landfill siting authority cannot receive confidential legal advice from outside counsel. They did receive the memo. I assume some of them read it, referred to it, but that was not, we don't see that as a waiver of privilege. Now, the other memo with the conditions was shared openly at the hearing, correct? That's correct. Those two memos were mentioned in the Yorkville siting ordinance and were intended to be part of the record. This third memorandum was not intended to be part of the record. How do we know that other than where is the provision in the ordinance or regulatory authority that says that that isn't part of the record? Well, there's nothing in the Yorkville siting ordinance that said the additional memorandum, well, it's not mentioned in the Yorkville siting, in the siting ordinance. Well, where is it said in the siting ordinance that there can be confidential memos to staff or to the board? Well, it wasn't addressed in the Yorkville siting ordinance. It was a legal memorandum requested by the city council and was delivered to the city council as part of the, as part of the procedure. But the, as I say, it was not addressed in the ordinance the way the other two were. But it's, there's nothing in the case law or otherwise that says a landfill siting authority cannot request confidential legal advice from outside council and receive that. If it was talked about, I think it was more than talked about. Frankly, I think there were some of the aldermen who said that as a result of or because of this report, I have these concerns. Did the PCV get to look at this report? This Roth report? The PCV did not look at the report. How could they evaluate all of the evidence? Well, Fox Marine did not ask for in-camera review of the memorandum. Fox Marine claims that the, that this memorandum was evidence. But it's a legal, that's a legal memorandum. It's not, it's not evidence. The evidence that the Pollution Control Board relied upon was the evidence in the 24,000 or so page record regarding all the various siting criteria that the Pollution Control Board found there was more than ample evidence to support a denial of the landfill siting application on all the various criteria. Number one, the Roth report is not a part of the record, is it? That's correct. And number two, the board found that it was privileged. That's correct. The attorney claimed privileged protection. That's correct. If we find that perhaps it should have been released, would it go back to the board to reconsider in light of everything they heard? Well, it could go back to the boards to reconsider, or this panel could, I guess, request an in-camera review of the memorandum to see how that would factor into the panel's decision. With my remaining time, I guess so. I had another question. Go ahead, Judge. Let me point out one thing. The way this is developing, I indicated there would be five minutes for rebuttal. I'm going to break that up into eight-minute sections. Each side will have eight minutes, so each attorney will have four minutes relative to their particular category of argument. Okay? So that's four for the appellant and four for each of us? It's four for each attorney, for the appellant and appellate. So each attorney can argue the issues that they presented in their initial argument relative to a reply to the other party. Do I make myself clear? Instead of if it were five minutes, each party, if they wanted to address or make a reply, would have two and a half minutes. That doesn't seem adequate. So now you have each party has four minutes to reply or rebut the opponent's argument. Okay. I did have a question with regard to this fairness and bias. Why shouldn't Fox Moraine have the opportunity to inquire into the deliberative process that the council members and aldermen used in denying the citing application? Well, they say that they should be allowed to ask the local decision-makers why they voted the way they did and what evidence they relied on in reaching that decision. And in support of Fox Moraine's argument, they rely on the Burkett case that went to the Illinois Supreme Court. That case involved solely documents. That involved a request for production. And the city of Chicago asked the courts, including the Illinois Supreme Court, to create a new privilege, the deliberative process privilege, to shield those documents from disclosure. And the city relied upon federal case law and an exemption in the Illinois Freedom of Information Act that had a similar exemption. So they were trying to shield the disclosure of documents. In our case, documents are not an issue. What Fox Moraine wants to do, wanted to do, was ask the local decision-makers to testify regarding their internal thought processes. And we're not asking the courts to create a new privilege. What we're simply asking the court to do in response to Fox Moraine's argument is recognize the deliberative process privilege as it has been applied in landfill citing proceedings for approximately 30 years now. The Illinois Appellate Court, including this court in the E&E hauling case, and the Pollution Control Board in several decisions have recognized that privilege. And they have compared it to, for example, a judicial privilege that you don't put a judge on the stand and ask him or her to explain why the judge reached a particular decision. The local citing authority in all these cases, whether it's a city council or a county board, they sit in a quasi-adjudicatory status, and they should be accorded that same privilege. Again, we're not shielding any documents or anything like that. We're simply asking the court to recognize what's been around for some 30 years now. Well, the Roth report could have been tendered under that process, couldn't it have been? Could it have been tendered under what process? If they, you know, the Burkett issue, they wanted documents. The city said no. Well, this was a way that they could have gotten the Roth report, isn't it? Well, the deliberative process privilege didn't apply to the Roth report. It was the attorney-client privilege that applied to that report. I understand. But that might have been another way that they were intending to get it. Well, that's not what they argued.  Thank you. Thank you. Thank you. May I please call Chuck Halston, also for the talent, Fox Moray. Justice Bowman, you had indicated that Mr. Mueller could have four minutes to address and rebuttal the criterion issues, and I could have four minutes on the balance. Could I take the entire eight and address all of the issues? Yeah. However you decide to handle the replies, fine with the court. Where the breakdown occurred was I thought my plan was that you would present, you have the burden of proof on the argument, and you would make the initial argument. Unfortunately, the city's attorney started and didn't want to stop it, but it will all work out. Okay. I guess the threshold issue is based upon your comment before, Justice Bowman. Do you have a question for me or does Justice Zinoff or Justice Hutchinson on the criterion eight issue? Because I'd be happy to address that if you have a question specific to that. Otherwise, I can go right into what I think are the answers to some of the issues that were raised by these parties and by the justices. I'd like to hear the answers, if that's all right with you, Justice Bowman. To the criterion eight? Yes, I'd like to hear your answers to the arguments. Sure. Here. First of all, I think, Justice Zinoff, you hit the nail on the head when you said, isn't there some type of threshold analysis that's involved here by the Pollution Control Board? It's our position that that was not done, because Mr. Mueller said, sure, the opinion was 84K. Excuse me, would you stand in front of the microphone, please? I'm sorry. It's hard because of the fan to hear you. The opinion was 84 pages, but 81 plus pages of the opinion were simply a summary of what went on with no critical analysis. I would even submit, if the court looks at page 83 of the decision, the Pollution Control Board gave no analysis to criterion two and criterion five, and little analysis to any of the other ones. Now, going to criterion eight, I believe there is a threshold requirement, Justice Zinoff and justices of the court. I believe under town and country, there's also a threshold analysis that has to be done by the Pollution Control Board on every criterion. Let me take criterion eight to begin with. Well, one quick question. What if the parties agree that it's been met or that there has been that threshold? Why would the PCB have to go over that? Because, again, as Mr. Mueller said, the local decision-maker in this case, this is a classic case. I've been involved in other ones where there are political motivations, clear political motivations. They are running for office. The court in town and country number two said, or number one, excuse me, Your Honor, said the Pollution Control Board isn't running for office. They don't have to please anybody locally, so they should go through a technical analysis. I believe at page 123 of the opinion it says, and I could actually read it verbatim, where they say that the pollution control board must engage in a technical analysis. Now, going to your issue before, when you said, isn't it scientific? I think technical embodies scientific. I think it embodies the analysis of the need criterion. As Mr. Mueller said, truly there are very few that are purely scientific. As Justice Zenoff pointed out, criterion eight is really more of a quasi-legal determination. There's a threshold determination that has to be met. Our position on criterion eight is there was no discussion whatsoever, and I think Mr. Legner actually conceded that. Mr. Legner, I think, conceded that by saying, well, they can't do that. I think, and Mr. Legner, Mr. Mueller, and I were at town and country before the Supreme Court. I believe the Supreme Court said, yes, there must be, or what's the purpose of section 40.1 of the act? As I believe Justice Thomas asked or made the comment at the hearing as I had arguments on that, and it might have been Justice Fitzgerald chimed in, the question came to Mr. Mueller and his co-counsel, well, are we to write out section 40.1 of the act? Is the Pollution Control Board, unless it goes through a critical analysis, are they to do nothing? What's the purpose? We should take a black pen and mark out section 40.1 of the act unless they go through some critical evaluation. I call it, Justice Hutchison, a critical evaluation. When all three of you ask the question, is it de novo, is it manifest wait, I am. I think that the Supreme Court in town and country did not expand or change the standard. I think they being part of the argument and reading the decision over and over and living with that case for five or six years, I think what they said is it needs to be defined and clarified because it's not being followed. What we're getting is a rubber stamp of a local citing decision, and that local citing decision may or may not be motivated by political forces or other forces. It was my contention in town and country number one that the decision had been made by that city council before the hearing ever started. In that particular case, there was a pre-hearing put on by the applicant before the city council, before the application was ever filed, and I said, well, the decision's been made before we ever got to the evidence in that case. Going to your point, there had to be a threshold evaluation, I believe, on Criterion 8 is, first of all, is the county plan applicable? That goes to the first section of both 39.2 and Criterion 8. It says if the facility is to be located, the key is what does located mean? Is that jurisdictionally or physically? It has to mean jurisdictionally because by necessity, every city municipality is physically included within a county, so there would be no need for the if. I think that's buttressed then by Section 39C because 39, if I may, 39.2A says the county board of the county, or here's the key, or the governing body of a municipality, and then it says, and I'd emphasize this, ladies and gentlemen of the court, as determined by Paragraph C of Section 39 of the Act, shall approve. The shall means the county can't take that jurisdiction away from a municipality if the site is to be located jurisdictionally. Shall approve. Let's go then, if we can, to Section 39C. 39C says no permit shall be granted unless the location of the facility has been approved either by the county, and here's the key, it says county if in an unincorporated area or the governing body of the municipality if in an incorporated area, so it has to be jurisdictional. I would submit the board should have looked at that. That's their job under technical review, which the Supreme Court said at page 123. You must do a critical evaluation and a technical review, and they should have said either, I think they could have decided in our favor on multiple grounds. The first is it's a matter of law. It wasn't located in the county, so the county plan's irrelevant. Number two, the update, the May 6, 2006 update was ambiguous on its face because it still said if the siting is going to take place, it said on one hand there can't be any siting outside, there can't be any siting within the municipality of a pollution control facility, which would be a transfer station or a landfill. The second thing that they said is, however, we're not prejudging any location. Well, of course you are. If you say that if you put a bar against a siting of a landfill within the boundaries of a municipality, of course you can. But the other fatal defect with the amendment was it said as to host agreements, if the facility is to be located within the county, then the county gets the host agreement. They're the host benefit party. If it's within the city, then the city's the host benefit. So it's ambiguous on its face. That should be construed against, that should have been construed as a matter of law against the draft of it, which was the county. That's just an example. If I could just address very quickly. Your time is up. If you want to make one more point in there. Thank you. Going to the fundamental fairness issue, Mr. Roth said, well, documents aren't involved. Documents are involved here. The Roth report, as Justice Hutchison pointed out, is directly involved. I don't think there is a deliberative process exemption, but I don't think you even have to get there. This report was substantively, as referred to by all three justices in your questions, this report was substantively relied upon in making the decision. The Yorkville, the city council, substantively relied upon it. So you can't hide that. The act says 39.2 says the decision shall be made on the entire record. And we're governed, as Mr. Dombrowski said, by E&E hauling, which says we have adjudicative due process standards, which mandate that all parties get a fair look at what was considered, what factors were considered. This report was not one less point. This report was not commissioned by the city council. This report was commissioned by Valerie Bird before she was even elected, sworn in as mayor. The city council did not ask for this. And one of the justices made an excellent point, among many excellent points, which was, does the ordinance that you've adopted to govern this process, I believe it was you, Justice Hutchison, does the ordinance that governs this process to afford fundamental fairness allow you to keep a report private? Well, certainly not. The Dirk Price report, Mr. Price had his hand up and showed me. I think, you know, I'll pass. I'm going to add another 10 minutes or so. I thank you for your time. Thank you, Your Honors. I'll turn to back to town and country and then criterion eight. Just touching back on town and country and briefly, that court did not address directly what the standard of review to be applied by the police control board to the local setting authority is. The court did state at page 123 of the decision. Instead, the board applies that technical expertise and examined the record to determine whether the record supported the local authorities conclusions. Not that the board applies its technical expertise to determine de novo whether the applicant met the criteria, but whether the record supported the local authorities conclusions. That puts to rest the notion that town and country somehow changed the decision making process that had been going on for decades in these cases. And as an additional final point on town and country, the case town and country certainly did not say that it's tied to the police control board being a rubber stamp, especially in that case where the police control board, in fact, reversed the local siding authorities finding. Turning to criterion eight, to clear up a little bit of confusion or perhaps talking across each other, what the board did on criterion eight was it determined that the police control facility was going to be located in a county that has a solid waste management plan. It then determined whether that plan or whether the facility would be consistent with that plan. The plan, the board determined, interpreted the plan to preclude a facility to be somewhere within the county that is in an incorporated area. In other words, that the plan only permitted the siding of a landfill facility in an unincorporated area. To get there, the board read the plain language, including the amendment, which specifically said, 2006 amendment, which specifically said that there should be no landfill siding in incorporated areas, essentially. It read the various terms of the plan together in a way to make sense such that municipal siding was excluded under the plan. And it considered the testimony that was elicited before the local siding authority from the county board chairman stating what it meant. They had, in case it was ambiguous, they had the framers intent. They had the framers saying, this is what we intended. And it was that, and it was to exclude a municipal siding decision. He also testified, and this is Mr. Church, he also testified the fact that it still provides, the plan still provides that some host agreements shall be entered into with the municipality. Reflects the fact that the plan concerns all waste management facilities, not just landfills. So there can be things under the plan that can be sited within a municipality, just not landfills, which are explicitly excluded. If your honors have no other questions on these points, of course, I'll leave it to my co-counsel. Thank you very much, your honors. Thank you, your honors. Just one point I'd like to make briefly on the town and country and the standard of review issue. It is true that the Pollution Control Board is supposed to hold a hearing. It did hold a hearing. We had a two and a half day fundamental fairness hearing in April 2009 before a hearing officer of the Pollution Control Board. That is the hearing that the Pollution Control Board is obligated to hold. Section 40.1 says at that hearing, Pollution Control Board is not entitled to take any new evidence either for or against any of the landfill siting criteria. I think it's clear from the town and country case that the Pollution Control Board, yes, uses its technical expertise, but applies the manifest weight of the evidence standard to the decision of the local siting authority. Well, shouldn't it? I mean, I think one of the points that the appellant's trying to make is shouldn't they then say on Criterion 1, we find it is not against the manifest weight of the evidence? On Criterion 2, exercising our, you know, expertise, we find, did they do that? Well, the Pollution Control Board certainly did, yes. In two paragraphs or how? Well, in its 86 or whatever page opinion, Pollution Control Board went criterion by criterion and said this is the evidence that was induced below in favor of the criterion. This is the evidence against, and this is our decision. So they certainly did go criterion by criterion and determined and made their decision, but also applying the manifest weight of the evidence standard to the decision of the Yorkville City Council. And again, we agree that the board need only find that one of the nine criteria was not satisfied. That's correct. They don't have to find that every one was not satisfied. That's correct. That's very clear from 39.2 in the case law that the landfill applicant has the burden of establishing each of the nine or the ten, the ten different citing criteria. And just a couple points back on the Roth memo. On the waiver issue, Fox Marine didn't argue waiver in its brief, so we did not mention that in our brief. But we don't think that one alderman, Alderman Munns, who mentioned the Roth report at the deliberations, that he can waive privilege on behalf of the City Council. And also, the case law is very clear that the only requirements for the local citing authority is that they don't have to deliberate and they don't have to explain what they relied upon in reaching their final decision. But didn't they all spend some time at the council meeting on the night that the actual decision was made saying, on the basis of this, on the basis of that, don't we know that from what they said that night? Well, we do know what they said that night. We have the transcript. But they were not required to hold that deliberation. They went far beyond the requirements and said, okay, we're going to have a public hearing or City Council meeting. It's going to be transcribed. And each of the eight who voted on the application did speak, some more than others, and said, this is what we heard during the 24 days of testimony, and this is why we think we should vote up or down. But they weren't required to do that. And this was one of the issues, I think it was Councilman Spears said something in my research. But your position is that she had just reviewed her notes of the 24 days of hearings? Justice Hutchison, as I say, we have such a lengthy record here. They sat through 24 days of hearing testimony that probably resulted in well over 100 hours of testimony. Fox Marine put out eight or nine experts. It would be very difficult for them to, a month or two later, try to try to recollect everything that they had heard and read without being able to refer to their notes. But there's nothing in the record that says all the Spears or anyone else relied on anything outside of the record. And just ask that the panel affirm the Pollution Control Board's opinion in all respects. Thank you. Thank you.